IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>**222 Surrey Court, Martinsburg, West Virginia, as further described in Attachment A** | Case No. 3: 19 mj 9<br><br>UNDER SEAL |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, **Sergeant M. Zollinger**, being first duly sworn, hereby depose and state as follows:

### I. Introduction and Background

1.      Your affiant, Sergeant Matt Zollinger is an investigator with the City of Martinsburg Police Department. Sergeant Zollinger is presently assigned to the Eastern Panhandle Drug and Violent Crimes Task Force and has been deputized by the U.S. Department of Justice, Federal Bureau of Investigation as a "Special Federal Officer."

2.      Sergeant Zollinger has been a member of the Martinsburg City Police Department for approximately nineteen (19) years. Sergeant Zollinger graduated from Fairmont State College in 1998 with a Bachelor's Degree in Criminal Justice. Sergeant Zollinger obtained training in criminal investigations, drug identification, drug investigation techniques, and laws regulating controlled substances while attending the seven (4) month training course at the West Virginia State Police Academy. Sergeant Zollinger routinely performs investigative matters regarding the identification and detection of controlled substances.

3.      During his tenure with the Martinsburg City Police Department, Sergeant Zollinger has succeeded in utilizing proper investigative efforts which have led to the arrest and conviction of multiple violent and repeat offenders. Sergeant Zollinger's experience includes work as a uniformed officer, conducting criminal and drug investigations, and in doing so has become associated with drug dealers and users.

4.      Based on this experience, Sergeant Zollinger is familiar with habits, practices, terminology, drug use paraphernalia, and methods of communications with drug sources utilized by those individuals involved in the drug trade. Sergeant Zollinger is also familiar with the appearance of certain controlled substances such as marijuana, cocaine hydrochloride, cocaine base, heroin, LSD, and methamphetamine. Sergeant Zollinger has learned through the course of these investigations that evidence of crimes are concealed and/or deposited in dwellings, outbuildings, on the curtilage adjoining residences and in vehicles located on

2

the property.  Sergeant Zollinger has been involved in numerous successful search warrant efforts leading to drug and violent crime arrests.  In May of 2010, Sergeant Zollinger was assigned to Eastern Panhandle Drug & Violent Crimes Task Force as the task force coordinator, a non-uniform position, in which investigations of violent crimes, drug related crimes and unconventional crimes are primarily conducted.

5.      Sergeant Zollinger has found that individuals who deal in controlled substances derive profits from these dealings and often have cash proceeds in their immediate possession.  In addition to cash, drug dealers also maintain records of sales, credits (fronts), and debts to their associates, which are sometimes documented in code; as well as names, telephone numbers and addresses of their suppliers, customers, and associates.  Sergeant Zollinger has also learned those in the drug trade will photograph themselves and associates with controlled substances, drug related assets, drug paraphernalia, cash, and firearms.  Firearms are routinely recovered in drug and violent crime investigative efforts.  Individuals involved in the drug trade utilize firearms for protection, intimidation, and trading.

6.      Furthermore, Sergeant Zollinger has learned that those involved in the drug trade routinely utilize telephones, cellular telephones, caller ID devices, two way radios and pagers for communication with their associates.  These devices create records, which lead to the identification of coconspirators and associates.  Drug dealers commonly utilize scanners and RF detectors in an attempt to monitor police radio traffic and to electronically search drug customers for radio frequency transmitters, which are frequently used by Law Enforcement while investigating crimes involving the illegal possession and distribution of controlled substances.

7.      Since his assignment to the Eastern Panhandle Drug and Violent Crimes Task Force, Sergeant Zollinger has acted in an undercover capacity and has participated in numerous "controlled purchases", in which a Cooperating Individual was used to purchase controlled substances.  Sergeant Zollinger has also conducted several drug related interviews of convicted drug dealers and drug users.

8.      Based upon Sergeant Zollinger's training, knowledge, experience, and participation in other investigations involving Controlled Dangerous Substances (CDS), Sergeant Zollinger knows:

   a.      That large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies.

   b.      That even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets, and/or exercise dominion and control over them.

   c.      That large scale drug traffickers must maintain, on hand, large amounts of U.S.

3

currency in order to maintain and finance their on-going narcotics business.

d.   That it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  That the aforementioned books, records, receipts, notes, ledgers and other papers are maintained for extended periods of time beyond the actual occurrence of the sale of these controlled substances and are usually kept where the traffickers have ready access to them.

e.   That it is common for large scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their vehicles, their businesses, the residences of relatives and associates, safe deposit boxes, self-storage units and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities.

f.   That in order to accomplish this concealment, drug traffickers frequently build stash places within their residences, their businesses, the residences of relatives and associates, or use safe deposit boxes, safes or lock boxes, self-storage containers or burial in the ground.  There are a number of publications available instructing where and how to conceal drugs.  Copies of these types of publications have been found in the aforementioned locations of drug traffickers.

g.   That is common for persons involved in large scale drug trafficking to maintain evidence relating to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as: large amounts of currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, certificates of deposits, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, money wrappers, and other evidence of other financial transactions.  These items are maintained by the drug traffickers within their residences, their vehicles, their businesses, the residences of relatives and associates, safe deposit boxes, self-storage units and/or other locations over which they maintain dominion and control.

h.   That large scale drug traffickers often utilize electronic equipment such as computers, flash drives, external hard drives, telex machines, facsimile machines, currency-counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described above in items a, c, d, e and g above.

i.   That when drug traffickers amass large proceeds from the sale of drugs, they attempt to legitimize these profits through money laundering activities.  To

4

accomplish these goals, drug traffickers utilize, including but not limited to, domestic banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate agents, shell corporations, business fronts, and otherwise legitimate businesses which generate large quantities of currency to legitimize their illegal profits.

j. That the sale of marijuana, cocaine hcl, cocaine base, heroin, and other controlled dangerous substances generates large quantities of United States currency in small denominations (commonly referred to as "street money").

k. That it is common for drug traffickers to separate their "street money" by denomination and put this currency in rubber-banded stacks in varying $1000.00 increments to facilitate quick counting.

l. That the courts have recognized that the possession of small and medium denominations of currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the currency and drug transactions.

m. That it is common for drug traffickers to exchange "street money" (small denominations) for large denominations of currency which can be concealed in secure locations within their residences, their businesses, their vehicles, the residences of relatives and associates, safe deposit boxes, self-storage units and/or other locations in order to amass a larger amount of currency in a concealed area.

n. That cocaine hcl, cocaine base, heroin, and marijuana and/or other controlled dangerous substances traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization, and/or individuals involved in their money laundering activities.

o. That drug traffickers utilize cellular telephones and/or portable cellular telephones so as to make it more difficult for law enforcement authorities to identify and/or intercept their conversations.   That these traffickers use various electronic equipment in order to maintain contact between themselves and organization members such as text or instant messaging devices which allow the trafficker instant communication with his associates.   These organizations also use scanners and telephone tap devices in an attempt to develop their own intelligence information about police activities.

p. That drug traffickers often keep paraphernalia in their residence and vehicles, or residence of associates or relatives for packaging, cutting, weighing and distributing controlled dangerous substances; these paraphernalia include but are not limited to scales, plastic bags, and cutting agents.

q.     That drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product using still and video cameras. That these traffickers usually maintain these photographs and videos in their possession.

r.     That drug traffickers commonly have in their possession that is on their person; at their residences and/or businesses; and vehicles: firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. These firearms are used to protect and secure a drug trafficker's property. Such property may include, however, is not limited to: drug, records, proceeds and profits derived from drug trafficking.

These firearms are also used to prevent the theft of controlled substances and to protect dealers from law enforcement officers effecting a seizure and arrest. It has been Sergeant Zollinger's experience that drug traffickers also utilize firearms to intimidate persons who owe money for controlled substances provided on consignment.

9.     As a result, and upon a review of the information set forth, Sergeant Zollinger submits that there is probable cause to believe that within the premises described in this affidavit there may be firearms, controlled substances, records, documents, and ledgers that contain evidence of cocaine hcl, cocaine base, heroin, marijuana, and/or narcotic pill distribution being concealed in violation of Title 21 U.S.C. §§ 841 (a)(1) and 846. This affidavit is submitted in support of a search warrant for the following location: **222 Surrey Court, Martinsburg WV 25401, as further described in Attachment A.**

## II. Facts and Circumstances

10.     From approximately May 2018 through the date by which this affidavit is being authored, the FBI Pittsburgh Eastern Panhandle Safe Streets Task Force (EPSSTF) has been conducting an investigation revealing a criminal organization known to investigators as the TRIPLE CROWN CREW ("TCC"). The TCC is based in Berkeley County and Jefferson County, West Virginia. The TCC has conspired and engaged in the trafficking of large quantities of cocaine base and heroin to the Eastern Panhandle of West Virginia and surrounding areas.

11.     On June 21, 2018, officers from the EPD & VCTF made a controlled buy of heroin from JESSICA NICHOLSON outside of her residence located at 222 Surrey Court. During this controlled buy, CI- PUB made a series of controlled texts to NICHOLSON and was directed to come to her residence. CI-PUB was dropped off near the residence by officers and was then directed by NICHOLSON to the parking lot outside of her residence. Once in the area, NICHOLSON exchanged heroin with CI-PUB for $100 in recorded currency in the parking lot.

12.     On June 25, 2018, officers from the EPD & VCTF made a controlled buy of heroin from ANTHONY HARRISON who is JESSICA NICHOLSON'S boyfriend and resides at 222 Surrey court with her. CI-PUB sent controlled texts to NICHOLSON and arranged a heroin buy from

6

her. CI-PUB was searched and issued $60 in recorded currency by Sgt. Zollinger. CI-PUB then walked to 222 Surrey Court and went inside the fence surrounding the front year of the residence. Upon entering the yard NICHOLSON's boyfriend ANTHONY HARRISON was standing on the front porch. HARRISON and CI-PUB sat down on the steps and while speaking, HARRISON handed CI-PUB a piece of folded paper containing a quantity of heroin, in exchange CI-PUB handed HARRISON $60 in recorded currency. At the conclusion of the buy, NICHOLSON came out the front door of 222 Surrey Court and spoke to both HARRISON and CI-PUB. CI-PUB then left the area.

13.  On June 27, 2018, a confidential informant ("CI") being utilized by the EPSSTF was contacted by an individual known only at this time as "BIG HOMIE." BIG HOMIE was enquiring why the confidential informant had not contacted his new girl. BIG HOMIE informed the CI he needed the five (5) joints ($500) and stated his girl had a package of "uptown" for him/her. Through the CI's communications with BIG HOMIE and the task force officers' knowledge of coded communication and drug talk, the five joints meant $500 and "uptown" meant cocaine base. The CI told BIG HOMIE to tell his girl to contact him/her. Investigators determined BIG HOMIE's new female associate to be JESSICA SUE NICHOLSON.

14.  On this same date, NICHOLSON contacted the CI via cellular telephone advising she needed to meet him/her. Both parties agreed to meet at the Dollar General store in Kearneysville in Berkeley County, West Virginia. Upon meeting NICHOLSON, the confidential informant provided NICHOLSON with three hundred and fifty ($350) dollars to be paid on a drug debt owed to BIG HOMIE. NICHOLSON did not provide any narcotics to the CI but informed him/her she would being going "up the road" and asked the CI if he/she wanted NICHOLSON to contact him when she returned around midnight. The CI advised NICHOLSON he would contact her in the morning of June 28, 2018. Task force officers conducted physical surveillance of NICHOLSON's residence located at 222 Surrey Court in Martinsburg, West Virginia and observed NICHOLSON depart the residence in a dark colored Chevrolet Impala bearing West Virginia registration 3XC352. Task force officers were also conducting physical surveillance at the Dollar General store in Kearneysville, West Virginia and observed NICHOLSON arrive in the same dark colored Chevrolet Impala.

15.  On June 28, 2018, officers from the EPD & VCTF made a controlled buy of heroin from JESSICA NICHOLSON. CI-PUB made contact with NICHOLSON thru a series of controlled texts, and arranged a heroin buy with NICHOLSON at her residence at 222 Surrey Court. CI-PUB was dropped off near the residence and knocked on the front door. NICHOLSON let CI-PUB into the residence and exchanged a quantity of heroin with him/her for $140 in recorded currency. Following the buy, CI-PUB left the residence, and NICHOLSON remained inside.

16.  On July 5, 2018, officers from the EPD & VCTF made a controlled buy of heroin from JESSICA NICHOLSON. CI-PUB made contact with NICHOLSON thru a series of controlled texts and phone calls, CI-PUB arranged a heroin buy with NICHOLSON at her residence located at 222 Surrey Court. CI-PUB was dropped off near the residence and sat down on the front porch of NICHOLSON's residence. NICHOLSON came outside of the residence and sat on the steps,

7

and exchanged a quantity of heroin with CI-PUB for $140 in recorded currency. Following the buy, NICHOLSON was observed going back into the residence.

17.   On July 14, 2018, officers from the EPD & VCTF made a controlled purchase of heroin from ANTHONY HARRISON. CI-PUB and HARRISON arranged a $200 heroin buy. CI-PUB met with HARRISON on the road to the rear of 222 Surrey Court at the intersection of Surrey Court and Pendleton Drive. CI-PUB handed HARRISON $200 in recorded currency and in exchange HARRISON handed CI-PUB a quantity of heroin. Following the controlled buy officers observed HARRISON walking back towards 222 Surrey Court.

18.   On July 18, 2018, officers from the EPD & VCTF made a controlled purchase of heroin from ANTHONY HARRISON. CI-PUB text and called HARRISON and arranged a heroin buy from him. CI-PUB was issued $260 in recorded currency by officers. CI-PUB then walked to 222 Surrey Court and went inside. Once inside CI-PUB exchanged $260 in recorded currency with HARRISON for 2 pieces of paper containing heroin. At the conclusion of the buy, left the residence and ANTHONY HARRISON remained inside.

19.   On July 26, 2018, officers from the EPD & VCTF made a controlled buy of heroin from JESSICA NICHOLSON and her friend JOSHUA MILLER. Thru a series of controlled texts CI-PUB agreed to purchase $140 of heroin from NICHOLSON at her residence. CI-PUB then went to NICHOLSON'S residence at 222 Surrey Court. Once outside the residence JOSHUA MILLER came out of the front door of 222 Surrey Court and exchanged a quantity of heroin with CI-PUB for $140 in recorded currency. Following the transaction MILLER went back inside the residence and CI-PUB left the area.

20.   On August 16, 2018, Chief United States District Judge Gina Groh authorized interception of (681) 242-9207 (TT1), (843) 818-8441 (TT2), and (681) 242-9659 (TT3) filed at Northern District of West Virginia case number 3:18MC92. Interception began on August 20, 2018 and terminated on September 17, 2018. TT1 and TT3 were utilized by NICHOLSON. TT2 was utilized by NICHOLSON's co-conspirator, Anthony HARRISON.

21.   On September 4, 2018, officers conducting electronic monitoring of JESSICA NICHOLSON intercepted communications between her and BRIANNA MURRAY. NICHOLSON agreed to sell MURRAY a quantity of heroin for $40.00. NICHOLSON tells MURRAY to come on. A short time later surveillance in the area of 222 Surrey Court observes MURRAY's 2016 NISSAN Maxima with FL registration ISI J48 (VIN#1N4AA6AP1GC4299551), pull into the parking lot of Surrey Court. Surveillance then observes NICHOLSON come out of the residence and meet with the driver at the vehicle. After the meeting, NICHOLSON is observed going back into the residence.

22.   On September 5, 2018, officers conducting electronic monitoring of JESSICA NICHOLSON intercepted communications between her and her heroin supplier, GREG POLK. During these communications NICHOLSON and POLK agreed to meet at the Polo Outlets in Hagerstown Maryland, so that NICHOLSON could pay off her debt and receive more heroin. Surveillance

officers then observed BRIANNA MURRAY pick Jessica up at her residence in MURRAY'S 2016 NISSAN Maxima with FL registration ISI J48 (VIN#1N4AA6AP1GC4299551), and drive NICHOLSON to the Polo Outlets. NICHOLSON was then observed meeting with POLK in the store. Following the meeting, NICHOLSON was observed returning to 222 Surrey Court in MURRAY'S vehicle and going inside the residence.

23.    On September 6, 2018, officers conducting electronic monitoring of JESSICA NICHOLSON intercepted communications between her and BRIANNA MURRAY. During these communications, MURRAY asks NICHOLSON if she will be around at 3:30. NICHOLSON tells MURRAY that she needs to go to the store to get a new phone, and if MURRAY will drive her that she will give her $50 worth of heroin for $40. NICHOLSON then tells MURRAY that she needs the $20 that Murray owes on a past debt so MURRAY needs to bring $60 with her. Surveillance then observes MURRAY arrive in her2016 NISSAN Maxima with FL registration ISI J48 (VIN#1N4AA6AP1GC4299551).   NICHOLSON and HARRISON then exit the residence and get inside of MURRAY's vehicle, and the vehicle drives off.

24.    On September 7, 2018, officers conducting electronic monitoring of JESSICA NICHOLSON intercepted communications between her and BRIANNA MURRAY. NICHOLSON agreed to sell MURRAY a quantity of heroin for $40.00. A short time later, surveillance observes MURRAY's 2016 NISSAN Maxima with FL registration ISI J48 (VIN#1N4AA6AP1GC4299551), arrives and parks at the residence.   NICHOLSON then exits 222 Surrey court and gets inside of MURRAY's vehicle. After a short time, NICHOLSON exits the vehicle and returns to the residence and MURRAY's vehicle leaves the area.

25.    On September 11, 2018, officers conducting electronic monitoring of JESSICA NICHOLSON, ANTHONY HARRISON, and ERIN BREEN intercepted communications of BREEN asking NICHOLSON and HARRISON for $100 of heroin. BREEN tells HARRISON that they are coming to 222 Surrey Court and will be in silver Chevy Cruise. A short time later, Surveillance observes the Chevy Cruise arrive at the residence, and following the transaction the Cruise leaves the area.

26.    On September 13, 2018, officers conducting electronic monitoring of JESSICA NICHOLSON intercepted communications between her and CHAD HITE. HITE asks NICHOLSON if he can get a quarter of a gram of heroin. NICHOLSON tells him to come to the door of her residence. HITE is observed a short time later by surveillance officers entering the front yard of 222 Surrey court and going to the front door.

27.    On September 17, 2018, Chief United States District Judge Gina Groh authorized interception of (267) 253-3860 (TT5) and (314) 326-0887 (TT7) filed at Northern District of West Virginia case number 3:18MC103. Interception of TT5 and TT7 terminated on October 17, 2018. On October 22, 2018, Chief United States District Judge Gina Groh authorized an extension for continued interception of (267) 253-3860 (TT5), filed at Northern District of West Virginia case number 3:18MC103. The extension interception began on October 22, 2018 and terminated on November 20, 2018. TT5 and TT7 were utilized by Gregory POLK, Jr. ("POLK").

28.   Through monitoring intercepts of TT5 and TT7, investigators learned that POLK was residing in or around Philadelphia, Pennsylvania and supplying various local drug dealers in the Philadelphia area.  Additionally, POLK continued to communicate with his local drug dealers in the Northern District of West Virginia—specifically, NICHOLSON and Michael PAYTON. POLK coordinates travel down to the Martinsburg, West Virginia area to resupply NICHOLSON and PAYTON and to collect money owed by NICHOLSON and PAYTON for previously "fronted" heroin and cocaine.

29.   On November 20, 2018, United States District Judge Thomas Kleeh authorized interception of (267) 505-8270 (TT11), filed at Northern District of West Virginia case number 3:18MC109. The interception began on November 20, 2018 and is scheduled to terminate on December 19, 2018.  TT11 is utilized by Leroy GRIFFIN.

30.   Through monitoring intercepts of TT11, law enforcement learned that GRIFFIN utilized addresses in Martinsburg, West Virginia and Hagerstown, Maryland to assist in the trafficking of narcotics.  Additionally, investigators have learned that GRIFFIN has multiple sources of drug supply.

    i.   On December 2, 2018, task force officers intercepted voice call communications between Jason BRYANT and Leroy GRIFFIN.  During the communications, GRIFFIN advised that he was in the Martinsburg, West Virginia area collecting drug debt funds from other customers but that he had to travel back to Philadelphia, Pennsylvania to obtain more narcotics.  GRIFFIN then advised BRYANT that he would make a return trip to the Hagerstown, Maryland and Martinsburg, West Virginia area with deliver another shipment of narcotics the following day.

    ii.   On December 3, 2018 at approximately 14:15 EST, EPD&VCTF officers were monitoring precision G.P.S. locations being reported by an authorized vehicle tracker installed on POLK's Dodge Ram 1500 pick-up truck.  Officers identified that POLK's vehicle was traveling west away from Philadelphia, PA.  Officers continued to monitor the G.P.S. locations revealed that POLK ultimately traveled to Hagerstown, MD where he stopped at 16:48 EST, at a parking space located directly in front of BRYANT's identified address, 138 Winter Street, Hagerstown, MD. After a brief stay at BRYANT's residence, POLK's truck was tracked traveling back towards Philadelphia, PA where he ultimately returned home at approximately 19:50 EST.

    iii.   On December 3, 2018, at approximately 23:56 EST, task force officers intercepted a telephone call involving Jason BRYANT and Leroy GRIFFIN wherein BRYANT indicates that something was left at his house for GRIFFIN.  GRIFFIN asks if it is the "green" (marijuana) or "white" (cocaine or heroin).  BRYANT advises it is the green, and asks if he needed it tonight.  GRIFFIN advises that he would get it tomorrow. GRIFFIN tells BRYANT he will send the "big butt white girl" to pick it up.

10

Investigators believed the "big butt white girl" to be Jessica NICHOLSON based on prior deliveries made to Nicholson from Gregory POLK and GRIFFIN

iv. On December 4, 2018, investigators intercepted a series of voice calls between GRIFFIN (TT12) and BRYANT. In these calls, GRIFFIN and BRYANT coordinate a meeting location for GRIFFIN's "runner" (believed to be NICHOLSON) to meet with BRYANT and pick up the drug package in Hagerstown, Maryland. GRIFFIN's efforts to coordinate NICHOLSON picking up the drug package from BRYANT end successfully as evidenced in intercepted voice communications over GRIFFIN's phone (TT11). The intercepted communications revealed BRYANT to be within minutes of meeting NICHOLSON at a gas station identified by officers as the Exxon gas station located at 301 N. Burhans Ave., Hagerstown, Maryland. EPD&VCTF investigators obtained video surveillance footage from the captioned gas station which captured video of NICHOLSON's vehicle, a white Chevrolet Impala pulling into the gas station parking lot followed shortly thereafter by BRYANT's vehicle, a gray Ford Fusion sedan, pulling into the parking lot. The meeting between NICHOLSON and BRYANT occurred in an area outside of the camera's viewing area. However, investigators were able to review surveillance footage from earlier on the same day that positively confirmed BRYANT as the driver of the gray Ford Fusion sedan. Both BRYANT's vehicle and NICHOLSON's vehicle were observed leaving the Exxon gas station parking lot a few minutes after arriving.

v. On the same date, December 4, 2018, stationary surveillance officers were posted at 40 Litchfield Lane E., Martinsburg, WV where GRIFFIN was known to be staying during his travels to Martinsburg, WV from Philadelphia, PA. Approximately one hour after NICHOLSON's vehicle was observed traveling to meet with BRYANT in Hagerstown, the stationary surveillance units at 40 Litchfield Lane E., observed NICHOLSON driving the white Chevrolet Impala on Dunrobin Drive toward Litchfield Lane. Officers positively identified NICHOLSON as the driver of the vehicle and observed her to park the vehicle in front of the 40 Litchfield Ln., E residence. After parking the vehicle, a white male exited the captioned residence and walked to NICHOLSON's vehicle where he lifted the hood of the vehicle. Due to the position of NICHOLSON's vehicle, surveillance officers were not able to observe the white male behind the hood of NICHOLSON's vehicle. The white male then shut the hood, walked over to briefly speak with NICHOLSON from the driver's side window, and then entered the 40 Litchfield Ln. E residence. At this time, NICHOLSON drove away from the residence. Her vehicle was later observed to be parked in front of her residence, 222 Surrey Ct., Martinsburg, WV.

vi. On December 5, 2018, investigators conducted physical surveillance on NICHOLSON'S residence located at 222 Surrey Court in Martinsburg, West Virginia and observed the white 2007 Chevrolet Impala bearing West Virginia registration NYD740 parked directly in front of the residence.

vii. On December 6, 2018, investigators conducted a state of West Virginia Department of Motor Vehicles inquiry on the displayed West Virginia registration plate number NYD740. The DMV response indicated the registration plate to be registered to Bruce Nicholson on a 2007 Chevrolet bearing VIN 2G1WB58K979200679. Bruce Nicholson is the father of JESSICA SUE NICHOLSON.

31. On December 13, 2018, officers conducting surveillance at 222 Surrey Court observed JESSICA NICHOLSON and ANTHONY HARRISON arrive at the residence in a vehicle registered to BRUCE NICHSOLON and go inside.

32. On December 27, 2018, EPD&VCTF officers monitoring intercepted communications occurring over LEROY GRIFFIN's cellular telephone's 267-505-8270 (**TT11**) and 847-287-1116 (**TT12**), intercepted communications with JASON BRYANT (240-203-1080) which indicated BRYANT and GRIFFIN to be engaging in drug distribution activity. Specifically, at approximately 1010 EST, GRIFFIN called BRYANT and recommended that BRYANT "see what it clocks in at" referring to weighing recently acquired narcotics. GRIFFIN then asks BRYANT if he has any "sandwich bags" referring to drug packaging material. BRYANT confirms that he understands GRIFFIN and will bring the bags. At approximately 1148 EST, GRIFFIN calls BRYANT and asks if he wants GRIFFIN to come to BRYANT's residence, known to investigators as 138 Winter Street, Hagerstown, MD. BRYANT advises that he wants GRIFFIN to come to the residence.

33. On December 27, 2018, EPD&VCTF officers monitoring intercepted communications occurring over LEROY GRIFFIN's cellular telephone's 267-505-8270 (**TT12**) and 847-287-1116 (**TT12**), intercepted communications with Jessica NICHOLSON (847-287-1116) which indicated GRIFFIN and Jessica NICHOLSON to be engaging in drug distribution activity. Specifically, at approximately 1338 EST, Jessica NICHOLSON advised that she was getting ready to "pull in" (referring to her arriving at the residence identified as 40 Litchfield Ln., E., Martinsburg, WV) and requested that GRIFFIN meet her outside. Several minutes after intercepting the aforementioned 1338 EST communication, EPD&VCTF surveillance officers observed Jessica NICHOLSON exiting the residence located at 40 Litchfield Lane E., Martinsburg, WV. Jessica NICHOLSON then entered a white Chevy Impala as a front seat passenger. At approximately 1730 EST, EPD&VCTF surveillance officers observed the white Chevy Impala to be parked directly in front of the residence located at 222 Surrey Ct., Martinsburg, WV.

34. On December 31, 2018, EPD&VCTF officers monitoring intercepted communications occurring over LEROY GRIFFIN's cellular telephone's 267-505-8270 (**TT11**) and 847-287-1116 (**TT12**), intercepted communications with JASON BRYANT (240-203-1080) which indicated BRYANT and GRIFFIN to be communicating about drug distribution activity. Specifically, at 0005 EST GRIFFIN asks BRYANT if "Everything OK" indicating that GRIFFIN is preparing to make a trip from Philadelphia, PA to Martinsburg, WV and is inquiring if BRYANT needs to be resupplied with drugs. BRYANT responds that he is "great" and that he is "back." BRYANT is indicating that he still has drugs to sell and that the quality of the drugs are better than the last batch that was supplied by GRIFFIN. GRIFFIN then replies "if you need me call me" indicating

that he can make a trip to Hagerstown to resupply BRYANT when he is ready.  BRYANT responds "definitely."

35.    On December 31, 2018, EPD&VCTF officers monitoring intercepted communications occurring over LEROY GRIFFIN's cellular telephone's 267-505-8270 (**TT12**) and 847-287-1116 (**TT12**), intercepted communications with JESSICA NICHOLSON (847-287-1116) which indicated GRIFFIN and Jessica NICHOLSON to be engaging in drug distribution activity.  Specifically, at 0101 EST, GRIFFIN sent a text message to NICHOLSON advising that he is going to come down to see her in Martinsburg, WV.  At approximately 1330 EST GRIFFIN talks to NICHOLSON and asks her if she needs him to bring "extra down" indicating that GRIFFIN was in a position to bring additional heroin with him down to Martinsburg, WV.  GRIFFIN further advised NICHOLSON that if "he had the money he (GRIFFIN) could use it." Based on previously intercepted communications, investigators are aware that GRIFFIN is referring to NICHOLSON's father, BRUCE NICHOLSON.  Jessica NICHOLSON advises that she believes he (BRUCE) has "one" ($1000) now but that she will call him.  Additionally, Jessica NICHOLSON advises that he (BRUCE) is able to sell cocaine for GRIFFIN.

36.    On December 31, 2018 at approximately 1329 EST, EPD&VCTF officers utilizing surveillance equipment and monitoring surveillance video captured near GRIFFIN's residence, 258 Rosemar Street, Philadelphia, PA, observed a Ram pick-up truck bearing Pennsylvania license plate ZLR7704, belonging to GREG POLK, was observed turning onto Rosemar Street, then turning right onto N 2nd Street to ultimately turn into the alley and stop behind 258 Rosemar Street.  At approximately 1403 EST, officers observed GRIFFIN exit the residence located at 258 Rosemar Street, turn left and walk toward N 3rd Street and then turn to walk toward the aforementioned alley located behind 258 Rosemar Street.  At approximately 1425 EST, officers observed POLK's truck to drive away from the alley area, turn onto Rosemar Street, and drive away from the area.  Investigators confirmed POLK to ultimately return and park his vehicle in the parking lot outside of 7901 Henry Avenue, Philadelphia, PA.  At approximately 1645 EST, EPD&VCTF officers conducting physical surveillance observed GRIFFIN operating a silver BMW sedan bearing Pennsylvania license plate KKR4402, approaching a toll booth, exiting off the Pennsylvania Turn-pike to US-11 in Carlisle, PA.  GRIFFIN was observed to have an unidentified passenger in the vehicle.  Surveillance officers followed GRIFFIN from Carlisle, PA to I-81 South.  GRIFFIN traveled on I-81 South through Maryland and into West Virginia.  The West Virginia State Police (WVSP) conducted a traffic stop on I-81 near exit 23 in West Virginia and ultimately recovered large, packaged quantity of suspected heroin and cocaine base.  Additionally, smaller individual bags of suspected heroin and cocaine base were recovered along with three containers of marijuana.  GRIFFIN was determined to be accompanied by his nineteen-year-old son, TYQUIL GRIFFIN.  Both vehicle occupants were arrested by the WVSP and charged with possession with intent to distribute narcotics.

## III. Conclusion

37.    Based on your affiant's training, knowledge and experience, and all of the information provided,

your affiant believes that Jessica NICHOLSON, Anthony HARRISON, Leroy GRIFFIN, Jason BRYANT, and Gregory POLK, Jr.'s, were engaged in the commission of distribution of and possession with intent to distribute heroin, and continues to be involved in a drug conspiracy for the purpose of which is to possess with intent to distribute and to distribute heroin.

38.     Your affiant believes that based on the investigation into Jessica NICHOLSON, Anthony HARRISON, Jason BRYANT, Leroy GRIFFIN, and Gregory POLK, Jr.'s involvement in the distribution of drugs; the intelligence gathered of trafficking/distributing heroin by NICHOLSON, HARRISON, GRIFFIN, BRYANT, and POLK; that a search of the residence described herein may produce further evidence of these on-going crimes.

39.     Your affiant believes that there is probable cause demonstrated in this affidavit that physical and documentary evidence as described in Attachment B is being concealed in the residence described above and in Attachment A, relating possession with intent to distribute and conspiracy to possess with intent to distribute cocaine hcl and cocaine base, which are Schedule II controlled dangerous substances, and heroin, which is a Schedule I controlled dangerous substance. Therefore, your affiant requests that this court authorize a search warrant for the aforementioned dwelling.

Sergeant Matthew Zollinger
Martinsburg City Police/EPD&VCTF

Sworn to and subscribed to me this ___2nd___ day of January, 2019.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE

14